Timothy Scott MESKIMEN, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2011–SC–000709–MR.

Supreme Court of Kentucky.

April 25, 2013.

Rehearing Denied Feb. 20, 2014.

---

Thomas More Ransdell, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for Appellant.

Jack Conway, Attorney General of Kentucky, Jason Bradley Moore, Assistant Attorney General, Office of Criminal Appeals, Office of the Attorney General, Frankfort, KY, for Appellee.

Opinion of the Court by Justice SCOTT.

A Fayette Circuit Court jury found Appellant, Timothy Meskimen, guilty of first-degree manslaughter, first-degree tampering with physical evidence, third-degree alcohol intoxication, and third-degree criminal trespass. For these crimes, Appellant received a twenty-five-year prison sentence. He now appeals as a matter of right, Ky. Const. § 110(2)(b), alleging that the trial court erred by: (1) allowing the use of Appellant's coerced statements in violation of his constitutional rights, (2) failing to suppress the evidence of subsequent statements made during his hospitalization, (3) denying his motion to suppress evidence of hair comparisons, and (4) summarily imposing a consecutive six-month sentence for indirect contempt. For the reasons that follow, we affirm Appellant's conviction and sentence.

## I. BACKGROUND

Edgar Hurst was a homeless man who lived on the streets of Lexington prior to his murder in 2010. Appellant was also homeless and living in Lexington at the time of Hurst's murder. About a year and a half prior to Hurst's death, Appellant met Donna Franklin. Despite their dysfunctional relationship, they began living together on the streets. They traveled around quite a bit, but eventually set up camp in the median at the intersection of I–75 and North Broadway. Appellant worked what odd jobs he could, but he and Franklin drank up all his earnings.

On the day of Hurst's death, Appellant and Franklin cleaned a Lexington office building and bought some whiskey. The first bottle went quickly, and then they sat around the campsite sharing the second bottle. When it began to run low, Appellant decided he needed to get more. Around midnight, he walked to a liquor store and bought some more whiskey. On his way back, he saw Hurst sitting in the median of the Interstate. It was raining, so Appellant invited Hurst back to their campsite where he and Franklin kept a fire.

When the two men returned to the campsite, they sat around drinking whiskey with Franklin. After Franklin went to bed, however, Hurst, allegedly, asked Appellant: "How about when I, if I kill you when I done kill, when you pass out and have my way with your woman." The two men then got into a fight. When it was over, Appellant testified that he believed he had knocked Hurst out.

The following morning Appellant discovered Hurst was dead. He then dug a hole and covered the body with dirt, brush, rocks, and a door. Shortly thereafter, he and Franklin moved to a nearby motel where they spent the next three or four days drunk. Eventually they got into an argument, and Franklin called the police. Appellant was then forced to leave the motel.

A short time later, Franklin called the police again and told them Appellant had murdered Hurst. Later, she took the police to Hurst's body. An hour or so later, Appellant showed up at the motel highly intoxicated and was arrested and charged with alcohol intoxication (AI) and criminal trespass in the third degree.

Appellant was then taken to police headquarters for an interview. The interview lasted for approximately an hour. Several times during the interview, he asked to go to the hospital as he said he was in excruciating pain as a result of a visible head injury. Appellant, however, denied killing Hurst during this interview.

Later, when he was taken to the hospital, it was determined that Appellant had a skull fracture and brain injury that had likely occurred at least five days prior to his hospital admission. During the course of his hospital stay, however, he provided the police with two statements in which he admitted killing Hurst.

He was then indicted by a Fayette County Grand Jury and charged with murder, tampering with physical evidence, alcohol intoxication third or greater offense, and criminal trespass in the third degree.

Prior to trial, Appellant moved to exclude evidence of all three statements made to the police following his arrest.[1] After a hearing, the motion was denied. Appellant also filed a motion to exclude evidence of hair comparisons because they were unreliable, which the trial court also denied.

A Fayette Circuit Court jury eventually found Appellant guilty of first-degree manslaughter, tampering with physical evidence, alcohol intoxication, and third-degree criminal trespass. The jury then recommended Appellant receive the maximum sentence for each of the felonies, twenty years for manslaughter in the first degree and five years for tampering with physical evidence. The jury also recommended that the two sentences be served concurrently for a total of twenty years' imprisonment.[2] However, at the final sentencing, the trial judge disregarded the jury's recommendation that the felony sentences be served concurrently and ordered that they be served consecutively for a total sentence of twenty-five years.

After Appellant left the courtroom following sentencing, the trial judge began another hearing. During that hearing the bailiff approached the bench, and the trial judge directed that Appellant be kept in a holdover cell after the bailiff informed the trial judge that Appellant had "flipped off" the news media on his way out of the courtroom. Later, the trial judge summarily held Appellant in contempt and sentenced him to an additional six months to be served consecutively to his twenty-five-year sentence. Additional facts will be developed as necessary.

## II. ANALYSIS

### A. Coerced Statements

Appellant first argues that the use of his statements to the police violated his right to counsel and his right to remain silent as guaranteed by the Fifth and Sixth Amendments. Specifically, Appellant alleges the statement obtained during the initial inter-

---

1. Even though Appellant denied having any part in Hurst's death during the interview at the police station, defense counsel sought exclusion of the statements so they could not be used for impeachment purposes at trial, given that he ultimately confessed to the crime during his hospital stay.

2. The parties agreed to allow the trial judge to set the punishment for the misdemeanor offenses.

rogation at police headquarters should have been suppressed because his complaints about a head injury and requests to go to the hospital were an invocation of his right to remain silent, and that the failure of the detectives to stop questioning him and take him to the hospital amounted to coercive conduct.[3]

■ We review a trial court's order on a suppression motion using a two-step analysis. *Anderson v. Commonwealth,* 352 S.W.3d 577, 583 (Ky.2011) (*citing Commonwealth v. Whitmore,* 92 S.W.3d 76 (Ky.2002)). First, the factual findings of the trial court are conclusive if supported by substantial evidence. *Id.;* RCr 9.78. Second, if the findings are supported by substantial evidence, the appellate court conducts a *de novo* review to determine whether the trial court's ruling is correct as a matter of law. *Id.* (*citing Whitmore,* 92 S.W.3d at 79). Given that Appellant raises no issues of fact, we hold that the factual findings of the trial court are supported by substantial evidence.

■ As the second step in our appellate review, we must conduct a *de novo* review of the ruling on the motion to suppress to determine whether it was correct as a matter of law. *Id.* We hold that it is for the reasons that follow.

### 1. Right to Remain Silent

Upon arrest, Appellant was taken to the police station for questioning. At around 5:51 a.m. Detective Brislin began his interrogation of Appellant. Prior to the initiation of questioning, Appellant was given his *Miranda*[4] warnings, which he validly waived. The interview lasted approximately one hour, although at various points throughout the interview Appellant stated that he wanted to go to the hospital.

Appellant now argues that his requests to be taken to the hospital were clear and unequivocal invocations of his right to remain silent.

■ In *Miranda* the Court held:
[O]nce warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been invoked.

384 U.S. at 473–74, 86 S.Ct. 1602. "[A] suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" *Quisenberry v. Commonwealth,* 336 S.W.3d 19, 30 (Ky.2011) (*quoting Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). "The same standards apply to assertions of the right to remain silent." *Id.* (*citing Berghuis v. Thompkins,* 560 U.S. 370, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010)). In order to invoke the right to remain silent, a suspect must *clearly* articulate his desire in a manner that a reasonable police officer in the situation would understand that the suspect wished for questioning to cease. In the present case, Appellant simply asked to go to the hospital. Detective Brislin

---

**3.** This issue was properly preserved by defense counsel's motion to suppress.

**4.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

stated it was not uncommon for suspects to request medical attention to simply avoid answering uncomfortable questions. Furthermore, Detective Brislin stated that it was his belief that Appellant's head injury did not look as if it were enough to require immediate medical attention.

■ In a case somewhat similar to this one, we recently held that a suspect's repeated requests to be taken to jail were not sufficient to clearly invoke his right to remain silent. *Quisenberry,* 336 S.W.3d 19 at 33.

> [W]illiams contends these last remarks were, in effect, an invocation of his right to remain silent, that they amounted to a demand that the questioning cease and that he be taken to jail. Even if that *might* be what Williams meant to say, however, those remarks were far from unambiguous. They could just as well have been a concession of his predicament, a "You've got me; you might as well take me to jail." At the suppression hearing, Detective Arnold testified that he understood Williams's remarks in this latter sense, not as a request to cease the exchange and be taken to jail, but as marking Williams's realization that his blanket denials were not working and his situation was serious. As a reasonable officer could certainly have interpreted Williams's "take me to jail" remarks in that way and not as an assertion of rights, *Miranda* and *Edwards* [*v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) ] did not preclude further questioning.

*Id.* In the same vein, we hold that Appellant did not-by asking to be taken to the hospital—"clearly and unequivocally" invoke his Fifth Amendment right to remain silent in a manner in which a reasonable police officer in the situation would understand as a request for questioning to cease. Thus, we find no error in the trial court's denial of the motion to suppress.

### 2. *Involuntariness*

■ Furthermore, Appellant argues that his statements were involuntary given he was intoxicated at the time of the interrogation [5], was suffering from sleep deprivation, and was being denied medical treatment. However, "[a]n otherwise voluntary statement will not be excluded on the basis of intoxication unless the accused is 'intoxicated to the degree of mania, or of being unable to understand the meaning of his statements ... Loss of inhibitions and muscular coordination, impaired judgment, and subsequent amnesia do not necessarily (if at all) indicate that an intoxicated person did not know what he was saying when he said it.' " *Anderson,* 352 S.W.3d 577 at 583 *(quoting Britt v. Commonwealth,* 512 S.W.2d 496 (Ky.1974)). Put another way, the basic question is whether the accused was in "sufficient possession of his faculties to give a reliable statement." *Id.*

■ Having reviewed the record, we cannot say Appellant was so intoxicated as to reach the point of mania or give an unreliable statement. Following the suppression hearing, the trial court found Appellant was clearly not so intoxicated as to make his statements involuntary or untrustworthy. Moreover, from the recordings of the interview, it appears that Appellant was able to give a valid waiver of rights, understand Detective Brislin's questions, and answer appropriately. Detective Brislin testified at the suppression hearing that, based on his experience as a police officer, Appellant was not intoxicated to the point of being unable to make

---

**5.** Appellant admits to consuming approximately twelve beers in the hours leading up to the interrogation.

voluntary and trustworthy statements. Further, as the trial court noted, Appellant indicated he understood his *Miranda* rights and signed the waiver form.

██ Appellant also argues that his statements were involuntarily made given that he was subjected to sleep deprivation as a coercion tactic. In support, Appellant cites to *Ashcraft v. Tennesee,* 322 U.S. 143, 150, 64 S.Ct. 921, 88 L.Ed. 1192 (1944), to support his claim that sleep deprivation is an often-used and well-known tactic for coercing information out of detainees. However, Appellant's reliance on this case is misplaced given that the deprivation referred to in *Ashcraft* was hour upon hour of questioning, often by multiple officers. *Id.* Here, Appellant was questioned by Detective Brislin for approximately one hour. This hardly rises to the level of deprivation referred to in *Ashcraft,* and did not result in the coercive effects Appellant argues.

██ Appellant also argues that the withholding of immediately necessary medical care until a statement is given by a suspect is "unquestionably the type of interrogation technique that should be condemned by any civilized society." However, Detective Brislin testified that he did not believe that Appellant was suffering from an injury that was so serious that it required immediate medical attention; he felt Appellant was just trying to dodge the questions and the interview lasted roughly an hour after which Appellant was taken immediately to the hospital upon its conclusion. For these reasons, the trial court found the statements to be voluntary, and not the product of coercion.

For the reasons previously discussed, we find that Appellant's statements made at the police station were voluntarily made and thus the trial court's ruling is correct as a matter of law.

## B. Second and Third Statements

██ Appellant, next argues that the trial court erred in admitting incriminating statements he made while in the hospital. Specifically, Appellant alleges that these statements (in which he admitted that he killed Hurst) should have been suppressed, as forty-eight hours had passed without a probable cause determination. Appellant concedes, however, that this issue is unpreserved, but asks it be reviewed for palpable error. RCr 10.26; KRE 103.

██ "A finding of palpable error must involve prejudice more egregious than that occurring in reversible error, and the error must have resulted in 'manifest injustice.'" *Ernst v. Commonwealth,* 160 S.W.3d 744, 758 (Ky.2005) (internal citations omitted). "[P]alpable error ... [is] composed of two elements: obviousness and seriousness, the latter of which is present when a failure to notice and correct such an error would seriously affect the fairness, integrity, and public reputation of the judicial proceeding." *Id.* (internal citations and quotation marks omitted).

After the initial interview with Detective Brislin at the police station, Appellant was taken to the hospital where he was admitted and treated for head injuries. While in the hospital, the police conducted two additional interviews, and during the course of each of these interviews Appellant admitted to killing Hurst. Both confessions were qualified by the fact that Appellant claimed he was acting in self-defense. Appellant argues that both confessions should have been suppressed given that they occurred more than forty-eight hours after his arrest in violation of *County of Riverside v. McLaughlin,* 500 U.S. 44, 57, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). We disagree.

*McLaughlin* sets forth the following:
[W]here an arrested individual does not receive a probable cause determination

within 48 hours, the calculus changes. In such a case, the arrested individual does not bear the burden of proving an unreasonable delay. Rather, the burden shifts to the government to demonstrate *the existence of a bona fide emergency or other extraordinary circumstance.* The fact that in a particular case it may take longer than 48 hours to consolidate pretrial proceedings does not qualify as an extraordinary circumstance. Nor, for that matter, do intervening weekends.

*Id.* (emphasis added). Appellant argues that the police cannot indefinitely hold a defendant charged with a crime, even in a hospital, and continue to question him without giving him the opportunity for an arraignment and the appointment of counsel. While we do not find this statement to be untrue, it is simply not the situation in the present case.

Appellant was in the hospital for the treatment of a brain contusion and a fractured skull, both of which are serious injuries.[6] *McLaughlin* holds that if forty-eight hours have passed and no probable cause hearing has been held, then the burden shifts to the government to demonstrate an emergency or other extraordinary circumstance that would justify a delay in holding such hearing. *Id.* Here, however, the police were not holding Appellant in the hospital; he was in the hospital for treatment of the injuries he complained of in his initial interview. Hospitalization for the treatment of injuries to the skull and brain are to the exact type of emergency or extraordinary circumstance which *McLaughlin* states would justify a delay in a probable cause hearing.

For the reasons stated, we cannot find that the admission of the statements Appellant made to the police while he was in the hospital seriously affected the fairness, integrity, or public reputation of the proceeding and therefore, we find no palpable error in their admission.

### B. Daubert Hearing

Appellant next argues that the trial court erred to his substantial prejudice when it denied his motion to exclude physical evidence. Specifically, Appellant alleges the admission of hair comparisons was erroneous because the trial court failed to conduct a *Daubert* hearing.[7,8] We review a trial court's evidentiary ruling for abuse of discretion. *Anderson v. Commonwealth,* 231 S.W.3d 117, 119 (Ky.2007) (*citing Woodard v. Commonwealth,* 147 S.W.3d 63 (Ky.2004)). "The test for an abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* (*citing Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 581 (Ky.2000)).

Two hair samples were of significance in this case: (1) one found on a piece of wood that the Commonwealth inferred was used to hit Hurst in the back of the head and (2) one found on the underside toe area of Appellant's boot, which was used to create an inference that he had kicked Hurst in the head or stomped on his face. Appellant argued, before the trial, that hair comparison evidence was scientifically unreliable and, therefore, the evidence should not be admitted. The trial court denied Ap-

---

6. Appellant spent a total of four days in the hospital, two of which were spent in the ICU.

7. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

8. This issue is properly preserved by defense counsel's motion to exclude evidence of hair comparison, and defense counsel's request for a *Daubert* hearing on the motion.

pellant's motion on the basis that hair comparison evidence is scientifically reliable and admissible. Appellant now argues that the trial court erred by taking judicial notice that hair comparison evidence is scientifically reliable.

■■■ *Daubert* recognized that some scientific methods, techniques, and theories are so firmly established as to be proper subjects of judicial notice. *Johnson v. Commonwealth*, 12 S.W.3d 258, 261 (Ky.1999) (*citing Daubert*, 509 U.S. at 592, 113 S.Ct. 2786) *See also, Murphy v. Commonwealth*, 2008 WL 1850626, Ky., April 24, 2008 (No. 2007–SC–000176–MR). "[O]nce an appropriate appellate court holds that the *Daubert* test of reliability is satisfied, lower courts can take judicial notice of the reliability and validity of the scientific method, technique or theory at issue." *Id.* "Courts are right to admit or exclude much evidence without reinventing the wheel every time by requiring the parties to put on full demonstrations of the validity or invalidity of methods or techniques that have been scrutinized well enough in prior decisions to warrant taking judicial notice of their status." *Id.* (internal quotations omitted). "This Court holds that Kentucky trial judges may take judicial notice of those scientific methods or techniques that have achieved the status of scientific reliability, and thus a *Daubert* hearing is not required." *Id.* at 262. Indeed, "[e]vidence of hair analysis by microscopic comparison has been admissible

in this Commonwealth for many years." *Id.*

■■■ In this case, the Commonwealth offered evidence that has been admissible in the state of Kentucky for many years. Microscopic hair analysis is a scientifically reliable method, and we, therefore, do not require that a *Daubert* hearing be held with regard to the admittance of such evidence. We will not disturb the decisions of the trial court without a clear showing of abuse of discretion. *Partin v. Commonwealth*, 918 S.W.2d 219 (Ky.1996). In this case, there is no indication that the trial court abused its discretion in admitting the evidence. Thus, Appellant's argument is without merit.

■■■ With that being said, the state of scientifically accepted evidence is ever changing, and what is scientifically acceptable today may be found to be incorrect or obsolete in the future. In the present case, the trial court correctly took judicial notice of the acceptability of scientific methods, but this is not a rule that is "set in stone," and is subject to change with scientific discovery.[9] It is up to the trial courts to stay abreast of currently accepted scientific methods, as they are the gatekeepers for the admissibility of evidence. Therefore, even though case law may be in acceptance of a certain method of analysis, it is the trial court's duty to ensure that method is supported by scientific findings, or at least not seriously questioned by recent reputable scientific findings,[10] be-

9. In the present case, Appellant's brief draws the Court's attention to a 2009 article published by the National Research Council of the National Academies, which disputes the scientific accuracy of hair analysis. It is true that hair analysis has been called into question by several recent findings, including those of the Federal Bureau of Investigation (FBI). However, those findings question positive identifications based solely upon hair analysis, and analysis performed only on the

shaft of the hair (those not containing a root). Here, at least one of the samples contained a root and the examiner simply testified that the hairs had characteristics similar to those of Hurst. Furthermore, Appellant was fully allowed to cross-examine the witness about the limitations of hair comparison analysis.

10. A perfect example of why such review could occasionally be necessary is exemplified by *Ragland v. Commonwealth*, 191 S.W.3d

fore taking judicial notice of its acceptability. That of course was not the case here, thus, we find no error.

## C. Consecutive Sentence

 Lastly, Appellant argues that the trial court erred to his substantial prejudice by imposing a consecutive six-month sentence for contempt. This issue is admittedly unpreserved, but sentencing issues may be raised for the first time on appeal and Appellant is proceeding properly before this Court. *Cummings v. Commonwealth*, 226 S.W.3d 62, 66 (Ky.2007). "We review the trial court's exercise of its contempt powers for abuse of discretion. The test for abuse of discretion is whether the trial [court's] decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999) (internal citations omitted).

Appellant's case was followed by the Lexington news media, and several members of the media were present on the final day of his trial. At sentencing, the trial judge informed Appellant that under Kentucky law it was in his discretion whether to follow the jury's recommendation of concurrent sentences, and the fact that Appellant had buried Hurst in a shallow grave and covered him with a door "offended me greatly." Thus, the judge sentenced Appellant to consecutive sentences, overriding the jury's recommendation.

After the judge announced Appellant's sentence, Appellant's counsel asked him to call another hearing that he had scheduled that day. Shortly after that hearing began, a bailiff approached the bench and whispered something to the judge. At the conclusion of the hearing, the judge requested that Appellant be brought back in the courtroom. Appellant was resistant as the bailiff tried to bring him into the courtroom, and he kept arguing that "I've got nothing to say to him, I've got my time." As Appellant walked to the podium, he held out his hands and said "What the f**k you got to say now?"

The judge then explained:

> It's the court's understanding that as Mr. Meskimen was leaving the courtroom, in the colloquial sense he flipped off the news media, and so on, he may have been mad at me, I don't know. I tried to treat him with respect all through this thing. The sentence of the court was in accordance with his conduct.

In response, Appellant quipped, "Not what the jury wanted to do, was it, judge?" The judge responded:

> The court understands because he flipped off the media, the court also has heard, in graphic terms, Mr. Meskimen's refusal to come out of the holdover when requested by the court, he has cursed the court in graphic terms. The court has no choice but to hold Mr. Meskimen in contempt of court. I'm going to sentence you to an additional six months consecutive to the 25 years I've already given you sir.

 An act of contempt is "willful disobedience toward, or open disrespect for, rules or orders of court." *Commonwealth v. Burge*, 947 S.W.2d 805 (Ky.1996). A contempt occurring in the presence of the court is *direct contempt*, while a contempt committed outside the presence of the court is *indirect contempt. Id.* at 808.

569 (Ky.2006), which reversed a conviction and remanded for a new trial when the reliability of years of accepted Comparative Bullet Lead Analysis (CBLA) testing was not only questioned but wholly discredited. The Court observed in *Ragland* that the FBI had abandoned any continued use of or reliance upon CBLA, correctly characterized by the Appellant in the case as "junk science."

(emphasis added) Appellant relies on this distinction, and argues that the trial judge abused his power to hold someone in contempt given that he did not actually witness Appellant "flip off the news media in the colloquial sense." While this is true, Appellant did commit acts of direct contempt when he resisted coming back into the courtroom upon the judge's request and furthermore, when he cursed at the judge upon returning to the courtroom.

■ We have noted that criminal contempt includes those acts done in disrespect of the court or its processes or which obstruct the administration of justice or tend to bring the court into disrepute. "It covers not only acts which directly and openly insult or resist the powers of the court or the persons of the judges, but to consequential, indirect, and constructive contempts which obstruct the process, degrade the authority, and contaminate the purity of the court." *Mitchell v. Commonwealth*, 206 Ky. 634, 268 S.W. 313, 313 (Ky.1925). Based upon the facts of this case, we cannot conclude that the trial court abused its discretion in finding Appellant in criminal contempt of court.

### III. CONCLUSION

For the aforementioned reasons, we affirm Appellant's convictions and corresponding sentence.

MINTON, C.J., ABRAMSON, CUNNINGHAM, NOBLE, SCOTT, and VENTERS, JJ., sitting. All concur.