# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED:  APRIL 27, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0093-MR

ARAMIS SALATHIAN MURRAY                                        APPELLANT


V.
ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE JEFFREY A. TAYLOR, JUDGE
NO. 18-CR-00700


COMMONWEALTH OF KENTUCKY                                        APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Aramis Salathian Murray was convicted of murder by a Fayette County jury and sentenced to twenty-five years' imprisonment.  He appeals to this Court as a matter of right.[1]  Murray argues the trial court erred by: (1) failing to hold a *Faretta*[2] hearing on his motion for hybrid representation; (2) admitting evidence obtained in violation of his Fifth Amendment right against self-incrimination; (3) permitting a witness to offer opinion testimony on Murray's guilt; (4) admitting evidence of prior domestic violence; and (5) denying his claim of self-defense immunity.  Discerning no error, we affirm.

---

[1] Ky. Const. § 110(2)(b).

[2] *Faretta v. California,* 422 U.S. 806 (1975).

Three unmarried couples lived in a residence located in downtown Lexington, Kentucky: Murray and Helen Taylor; Jason Smith and Ashley Webb; and Denzel Greer and Shaquay Leavell.[3] The relationship between Murray and Helen was volatile. On April 22, 2018, after arguing most of the day, Murray told Helen to leave the house. Ashley convinced Helen to leave with her temporarily to let the situation defuse. The two women went to a nearby bus stop. At some point, Helen returned to the residence. When she returned to the bus stop, Murray followed her. He brandished a firearm and threatened to shoot Helen and Ashley. Murray then returned to the residence.

Jason and Denzel happened upon Helen and Ashley at the bus stop. Helen and Ashley told them about the situation. Jason and Denzel returned to the residence to confront Murray. When they arrived, Murray was sitting on the front porch. Jason approached Murray while Denzel remained on the sidewalk. The confrontation ended when Murray shot Jason twice in the torso and once in the center of the forehead.

After the shooting, Murray fled the scene and disposed of his firearm. When police arrived at the residence, numerous witnesses and bystanders were present. Police obtained a warrant for Murray's arrest based upon the witnesses' statements. Murray was located using cell-phone technology and arrested soon afterward.

---

[3] For clarity, we will refer to Murray by his last name and the other individuals by their first names.

Detective Matthew Merker of the Lexington Police Department interviewed Murray. Murray initially denied any involvement in the shooting, but later claimed self-defense and further informed Det. Merker where he had disposed of his firearm. Murray claimed Jason had threatened him with a gun belonging to Denzel and that Denzel must have removed the gun from Jason's body after the shooting. Police did not recover any weapons from the vicinity of Jason's body following a search of the residence and surrounding areas. Several witnesses also stated Jason did not own a gun.

Murray was charged with a single count of murder. Following a jury trial, he was found guilty and received a sentence of twenty-five years' imprisonment. This appeal followed.

For his first contention of error, Murray argues the trial court erred by failing to conduct a *Faretta* hearing on his motion to allow hybrid representation. We disagree.

Throughout the initial stages of the criminal proceedings in this case, Murray alerted the trial court to his dissatisfaction with appointed counsel. In April 2019, appointed counsel requested a competency evaluation. Murray was transferred to the Kentucky Correctional Psychiatric Center (KCPC) for evaluation, but Murray refused to cooperate. Murray also refused to allow appointed counsel any access to his medical records. Appointed counsel then sought a court order to be allowed access to the records.

On October 25, 2019, Murray appeared with appointed counsel before the trial court for a status conference on the competency issue. Murray

3

submitted a pro se motion for hybrid representation. The trial court explained it would not entertain any motions until the competency issue had been determined. At the next status conference, a different attorney ("conflict counsel") appeared on behalf of Murray. Conflict counsel informed the trial court he would be representing Murray because Murray had filed a federal lawsuit against the Department of Public Advocacy.

The trial court determined Murray to be competent to stand trial following a hearing conducted on August 31, 2020. After conflict counsel entered his appearance, Murray neither raised the issue of hybrid counsel nor voiced any further complaints regarding his representation.

Unlike the Sixth Amendment of the United States Constitution which guarantees a criminal defendant the right to counsel or, conversely, the right to self-representation, Section Eleven[4] of the Kentucky Constitution guarantees a criminal defendant the right to hybrid representation. *Deno v. Commonwealth*, 177 S.W.3d 753, 757 (Ky. 2005). Hybrid representation involves a limited waiver of the right to counsel where the defendant and his attorney essentially act as co-counsel. *Id.* A defendant's request for hybrid representation must be timely and unequivocal. *Id.* Such a request "is timely if made before meaningful trial proceedings have begun," and "unequivocal if the defendant specifies the extent of the services he desires." *Id.* at 758.

---

[4] Section Eleven of the Kentucky Constitution provides, "[i]n all criminal prosecutions the accused has the right to be heard by himself and counsel."

4

If a defendant makes a timely and unequivocal request for hybrid representation, the trial court has the duty to conduct a *Faretta* hearing. *Id.* At the hearing, the trial court must: (1) determine from the defendant's testimony whether the limited waiver of counsel is voluntary, knowing, and intelligent; (2) "warn the defendant of the hazards arising from and the benefits relinquished by waiving counsel;" and (3) enter findings on the record that any waiver is voluntary, knowing, and intelligent. *Id.* (quoting *Hill v. Commonwealth*, 125 S.W.3d 221, 226 (Ky. 2004). A trial court's ruling on the issue of hybrid representation is reviewed de novo. *King v. Commonwealth*, 374 S.W.3d 281, 290 (Ky. 2012). The improper deprivation of a defendant's right to hybrid representation cannot be deemed harmless error because "[t]he right is either respected or denied." *Id.* Nevertheless, "[w]hile the right to represent oneself is a structural right, its invocation does not set into motion rigid, mechanical procedures that must be followed to the letter to avoid an error." *Swan v. Commonwealth*, 384 S.W.3d 77, 94 (Ky. 2012). A request for hybrid representation may be waived or abandoned. *Id.*

Our decision in *Swan* is controlling. In *Swan*, the defendant timely and unequivocally requested hybrid representation. *Id.* at 92. The trial court passed the motion and stated that it could be raised again before the trial commenced at which point the court would conduct a *Faretta* hearing. *Id.* The defendant did not raise the issue again. *Id.* On direct appeal, this Court held the defendant abandoned his request. *Id.* at 95. The rule is a defendant may waive or abandon his request for hybrid representation if his subsequent

5

conduct indicates "he is vacillating on the issue or has abandoned his request altogether." *Id.* at 93-94 (citing *Brown v. Wainwright*, 665 F.2d 607, 611 (6th Cir. 1982)).

Murray cites *Mitchell v. Commonwealth*, 423 S.W.3d 152, 160 (Ky. 2014), for the proposition, "[a] defendant cannot be expected to continue to request a hybrid form of representation in the face of a judge who has made it clear he would not permit it." *Mitchell* is distinguishable on the facts. In *Mitchell*, the defendant requested to file a pro se motion after counsel refused to file it on his behalf. The trial court informed the defendant it would not accept any pro se motions because the defendant had counsel. The trial court informed the defendant that he could proceed pro se, but the court did not recommend it. The defendant responded he did not want to represent himself or otherwise discharge his counsel, but simply desired to file the motion because his counsel declined. The trial court informed the defendant his only options were to represent himself or proceed through counsel. Counsel requested the trial court to allow the defendant to represent himself solely for the purpose of the motion. The trial court refused to accommodate the request for limited waiver of counsel. The defendant later requested standby counsel.

On direct appeal, this Court held "the trial court erred by imposing a Hobson's choice on [the defendant]: either take counsel or leave it." *Mitchell*, 423 S.W.3d at 159. We further concluded the defendant's subsequent request for standby counsel did not constitute a waiver of his request for hybrid representation because "it is only logical that a defendant's request for hybrid

6

counsel would dissipate once the trial court ruled out such a manner of representation." *Id.* at 160.

In the present appeal, Murray timely and unequivocally requested hybrid representation. However, at the time Murray made his request, there was a legitimate issue concerning his competency to stand trial. The trial court properly declined to entertain the request for hybrid representation until Murray's competency had been determined.[5] The refusal of the trial court to entertain Murray's request for hybrid representation until the competency issue was resolved did not amount to a categorial refusal to entertain *that manner of representation.* Murray did not raise the issue of hybrid representation again following the competency determination and the appearance of conflict counsel on his behalf. Unlike the situation in *Mitchell,* the trial court in the present case gave no indication it would refuse to entertain a request for hybrid counsel at the appropriate time. Therefore, we conclude Murray abandoned his request for hybrid representation.

For his second contention of error, Murray argues the trial court erred by admitting evidence obtained in violation of his Fifth Amendment right against self-incrimination. We disagree.

Murray claims his allegation is preserved for appellate review through the filing of a pro se motion. At the same time Murray submitted his request for

---

[5] Once a defendant's competency to stand trial has been legitimately questioned, a trial court is obligated to suspend proceedings until the issue has been resolved. *Drope v. Missouri,* 420 U.S. 162, 182 (1975).

hybrid representation, Murray also filed a document styled "Notice of Complaint." In relation to the present claim, the pro se motion cited KRS[6] 422.110 and tersely stated, "[o]btaining confession/information by 'SWEATING' is prohibited."[7]

Under RCr[8] 8.18(f), a motion to suppress evidence, including evidence of an alleged confession, is required to be made before trial or "by any extension the court provides." A defendant's failure to comply with the deadline established by RCr 8.18(f) constitutes a waiver of the issue. RCr 8.18(2). Further, when a party fails to file a suppression motion and request a hearing, and fails to object to the admission of evidence when it is presented, the right to later raise the admissibility of such evidence is waived. *Deboy v. Commonwealth*, 214 S.W.3d 926, 929 (Ky. App. 2007).

As with his request for hybrid representation, Murray failed to renew this claim following the competency determination. Murray otherwise failed to object to the admission of the evidence at trial. Therefore, we conclude the issue was unpreserved. Murray has alternatively requested palpable error review.

---

[6] Kentucky Revised Statutes.

[7] KRS 422.110 provides:

No peace officer, or other person having lawful custody of any person charged with crime, shall attempt to obtain information from the accused concerning his connection with or knowledge of crime by plying him with questions, or extort information to be used against him on his trial by threats or other wrongful means, nor shall the person having custody of the accused permit any other person to do so.

[8] Kentucky Rules of Criminal Procedure.

8

Under RCr 10.26, palpable error is defined as an error that "affects the substantial rights of a party" and results in "manifest injustice." *Schoenbachler v. Commonwealth*, 95 S.W.3d 830,836 (Ky. 2003). A party may demonstrate manifest injustice upon a showing of the "probability of a different result or error so fundamental as to threaten . . . entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006).

Custodial interrogation must immediately cease upon a suspect's invocation of the right to remain silent. *Carson v. Commonwealth*, 621 S.W.3d 443, 451 (Ky. 2021). However, "any invocation of the right must be clear and unambiguous." *Id.* The intention to remain silent must be articulated "in a manner that a reasonable police officer in the situation would understand that the suspect wished for questioning to cease." *Id.* (quoting *Meskimen v. Commonwealth*, 435 S.W.3d 526, 531 (Ky. 2013)). Even if a defendant clearly invokes his right to remain silent, the invocation may be rendered ineffective if he continues "to speak to detectives on his own volition afterwards." *Id.*

Following his arrest, Murray was interviewed by Det. Merker at the police station. Murray initially denied shooting Jason. Later in the interview, Murray and Det. Merker had the following exchange:

**Murray**: I don't care. If there was no other gun on the scene, I didn't do it. And you all need to go find these f---ing people who keep doing this s--- to me.

**Det. Merker**: Aramis, listen.

**Murray**: No! F---k it. Ok. I want a ride.

**Det. Merker**: Listen, Aramis.

9

**Murray**:  No, I want to go.  No, I want to go.  Whatever the f---you're going to do with me, do it.

**Det. Merker**:  Right now, Aramis, do you know what you're looking at?  Murder.

**Murray**:  Murder? I ain't murdered nobody.

**Det. Merker**:  That's what you're getting charged with, Aramis, is murder.

**Murray**:  I didn't murder a damn person.

**Det. Merker**: You really don't want to give us why it happened, so we gotta go off what we have.

After this exchange, the interview continued for approximately thirty minutes. Murray eventually admitted to his involvement in the shooting and informed Det. Merker where he had disposed of the gun.

In *Carson*, we held a defendant's statement, "I want to get out of here," did not "clearly indicate that [the defendant] intended to remain silent and end the interrogation." *Id.* at 451-52.  Likewise, in the present appeal, Murray continued engaging with Det. Merker immediately after he stated, "I want a ride" and "I want to go."  The questioning continued for approximately thirty minutes.  Based on the foregoing, we cannot conclude Murray clearly and unambiguously invoked his right to remain silent.  Therefore, the admission of Murray's statements to Det. Merker did not amount to palpable error.

For his third contention of error, Murray argues the trial erred by allowing Det. Merker to express his opinion about Murray's guilt.  We disagree. Murray concedes this alleged error is unpreserved and requests palpable error review.

10

During its case-in-chief, the Commonwealth asked Det. Merker to explain the actions he took following his investigation. In response, Det. Merker stated:

> After I did the scene walk-through based on the interviews that were conducted and looking at the evidence from the scene, I completed what we call a criminal complaint for murder for the defendant, Aramis Murray. We complete those when probable cause exists. So, we write up basically why we believe the charge of murder is appropriate. We submit that on affidavit to a judge and judge reviews it. I contacted our county attorney, who has to approve all those first; I contacted him shortly after I completed that around 4 a.m. The judge signed it that night—signed that criminal complaint into a warrant for murder for his arrest.

Det. Merker did not express an improper opinion on Murray's guilt. Instead, he merely explained the basis for his belief probable cause existed to charge Murray with murder. In an unpublished opinion, this Court recently held such testimony did not amount to reversible error. *Capps v. Commonwealth*, No. 2020-SC-0105-MR, 2021 WL 1679934 at *14 (Ky. April 29, 2021). We distinguished between testimony relating to probable cause from opinion testimony concerning the ultimate question of guilt beyond a reasonable doubt. *Id.* The distinction lies in the standards underlying each concept:

> Probable cause sufficient to arrest someone and guilt beyond a reasonable doubt are two completely different standards of proof. And, our juries are intelligent enough to know that if a defendant is on trial, there was obviously probable cause to arrest or indict him for the crimes he is accused of committing.

*Id.* As such, testimony concerning a detective's basis for finding probable cause to arrest is distinguishable from situations where: (1) a witness directly stated he believed the defendant "dropped the hammer on the victim," (quoting

11

*Nugent v. Commonwealth*, 639 S.W.2d 761, 764 (Ky. 1982); (2) a police officer testified, "there had to have been some type of misconduct or I would not have received a complaint," (quoting *Bussey v. Commonwealth*, 797 S.W.2d 483, 485 (Ky. 1990); and (3) a detective testified the defendant "did not act like those who had lawfully protected themselves but, had instead acted like those who were fabricating a self-protection defense," (citing *Ordway v. Commonwealth*, 391 S.W.3d 762, 775 (Ky. 2013)). *Id.* In the present appeal, Det. Merker's testimony tracks the testimony we concluded was permissible in *Capps*. We cannot conclude the admission of Det. Merker's testimony amounted to palpable error.

For his fourth contention of error, Murray argues the trial court erred by admitting evidence of prior acts of domestic violence against Helen. Murray's claim of error regarding Helen's testimony is properly preserved for review. However, he failed to object to the admission of other allegedly improper evidence through Ashley's testimony and his own recorded statements.

Ashley testified on the first day of trial. She stated that Helen and Murray had been fighting throughout the day of the shooting. The argument began as a verbal altercation, but Ashley testified that at some point Murray hit Helen. Murray did not object to Ashley's testimony.

At the end of the first day of trial, the parties approached the bench in anticipation of Helen's testimony the next day. Defense counsel informed the court he believed Helen would be testifying regarding domestic violence committed by Murray, and he thought they should be cautious about the scope

12

of that testimony.  The trial court asked the Commonwealth if it intended to question Helen regarding domestic violence.  The Commonwealth informed the trial court it did not intend to inquire into the subject, but it could not necessarily anticipate Helen's testimony.  The Commonwealth further informed the trial court that it did not intend to explore any issues of domestic violence regarding Helen and Murray which had occurred before the day of the shooting.

On the second day of trial, Helen took the stand and testified in pertinent part:

> **Commonwealth**:  And April the 22nd, before Jason was shot, just describe what you were doing, how you were going about your day.
>
> **Helen**: Everything was okay except when things don't go his way.  And he does not know how to handle things as a man, so he would rather get mad and upset about it.  And we have disagreements as adults, but there is another way to go about it.
>
> **Com.**:  You and Mr. Murray were getting into disagreements that day?
>
> **Helen**:  Yes, pretty harsh disagreements.
>
> **Com.**:  When you say harsh, what do you mean by that?
>
> **Helen**:  Very verbal and then he got more physical after that.
>
> **Com.**:  That day the 22nd he got physical towards you?
>
> **Helen**:  Yes, he did.
>
> **Com.**:  What did he do to you?
>
> **Helen**:  He put his hands on me.

Defense counsel objected, and the following exchange occurred at the bench conference:

**Com**.:  I'm directing the testimony to specifically that day.  The events directly leading up to the shooting.  It's the catalyst.  It's the motive for her to leave the home.  And then subsequent to that, it's the reason why Jason confronted Mr. Murray in the first place.

**Trial Court**: Counsel you intentionally directed the witness to say something that should not be said at this trial [inaudible] . . .

**Com**.:  My understanding is we're not to elicit testimony on violence prior to that day.

**Trial Court**:  Well, what the heck did you just do?

**Com**.:  She's been talking specifically about April the 22nd.

**Trial Court**:  No, I'm sorry, that won't wash.  It's an improper question.  I sustain the objection.  Get off the issue of domestic violence.

**Com**.:  Yes, sir.

Murray did not request an admonition or any additional relief.

After the conclusion of Helen's testimony, the Commonwealth published a video recording of Murray's interview with Det. Merker to the jury.  During the interview, Murray stated he physically threw Helen out of the residence on the day of the shooting because she would not leave.  Murray did not object.

We cannot discern any error concerning Helen's testimony because a mere objection, without a subsequent motion for an admonition or mistrial, is not sufficient to establish reversible error if the objection is sustained.  *Soto v. Commonwealth*, 139 S.W.3d 827, 861–62 (Ky. 2004).

Further, we fail to discern any palpable error concerning Ashley's testimony or Murray's own statement regarding physically throwing Helen out of the house on the day of the shooting.  Under the Rules of Evidence, the Commonwealth is entitled "to present a complete, un-fragmented, un-artificial

14

picture of the crime committed by the defendant, including necessary context, background and perspective." *McLemore v. Commonwealth*, 590 S.W.3d 229, 235 (Ky. 2019) (quoting *Major v. Commonwealth*, 177 S.W.3d 700, 708 (Ky. 2005)). "[T]he jury [is] entitled to know the setting of the case and . . . receive evidence regarding the time, place and circumstances of the acts forming the basis of the charge against [the defendant] such that its decision would not have to be made in a vacuum." *Norton v. Commonwealth*, 890 S.W.2d 632, 638 (Ky. App. 1994). Both Ashley's testimony and Murray's statement concerned the events leading up to the crime. Murray's act of striking Helen set off the chain of events which culminated in the murder of Jason. The confrontation between Murray and Jason was thus directly related to Murray's actions towards Helen on the day in question. There was no error, palpable or otherwise, in the admission of this evidence.

For his fifth and final contention of error, Murray argues the trial court erred by denying his claim of self-defense immunity. We disagree.

Prior to trial, Murray filed a motion to dismiss the murder charged based on self-defense immunity under KRS 503.085.[9] Following a hearing, the trial court determined there was probable cause to conclude Murray's use of force

---

[9] KRS 503.085(1) provides civil and criminal immunity from to any person whose use of force is legally justified.

15

was not legally justified.[10]  Consequently, the trial court denied the motion to dismiss.

This Court has held any question regarding the application of KRS 503.085 is "purely academic" where a defendant "has been tried and convicted by a properly instructed jury in a trial with no reversible error."  *Rodgers v. Commonwealth*, 285 S.W.3d 740, 756 (Ky. 2009).  Further appellate review is unwarranted in such circumstances because the defendant's "self-defense claim has been thoroughly examined by both the trial judge under the directed verdict standard and the jury under the court's instructions and his entitlement to self-defense has been rejected."  *Id.*; *see also Ragland v. Commonwealth*, 476 S.W.3d 236, 246 (Ky. 2015).  We need not revisit the self-defense immunity issue based on our determination Murray was properly convicted in a trial without reversible error.

Accordingly, the judgment of the Fayette Circuit Court is affirmed.

All sitting.  All concur.

---

[10] The controlling standard on a motion to dismiss for self-defense immunity is whether there is "probable cause to conclude that the force used by the defendant was not fully justified."  *Rodgers v. Commonwealth*, 285 S.W.3d 740, 754 (Ky. 2009).

COUNSEL FOR APPELLANT:

Shannon Dupree
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Stephanie L. McKeehan
Assistant Attorney General