RENDERED: APRIL 29, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2019-SC-0585-MR

ROBERT CARSON JR.                                APPELLANT

                 APPEAL FROM KENTON CIRCUIT COURT
V.              HONORABLE GREGORY BARTLETT, JUDGE
                         NO. 14-CR-00287

COMMONWEALTH OF KENTUCKY                     APPELLEE

**OPINION OF THE COURT BY JUSTICE LAMBERT**

**<u>REVERSING AND REMANDING</u>**

Robert Carson Jr. appeals from a judgment of the Kenton Circuit Court convicting him of four counts of first-degree sexual abuse; three counts of first-degree sodomy; and three counts of incest. Carson contends that the trial court erred by 1) denying his motion to suppress his statements to police; 2) permitting the investigating detective to give an improper lay opinion as to Carson's veracity; and 3) allowing the prosecutor to provide unsworn testimony through her questioning. After review, we conclude that the trial court properly denied Carson's motion to suppress. However, the trial court erred by permitting the investigating detective to provide lay opinion testimony regarding his conclusion that Carson was lying during his interview derived

from behavioral analysis. This error warrants reversal, and we remand the case for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In December 2013, Stephen,[1] then ten years old, disclosed to a family member that Carson subjected him to sexual contact on multiple occasions. Stephen later told a social worker at the hospital that Carson touched his butt and genitals and kissed him. Following this hospital visit, relatives of Stephen reported these incidents to Covington Police. Police referred Stephen to the Children's Advocacy Center (CAC). During his CAC interview, Stephen claimed that Carson had touched his genitals and butt on several occasions.

Detective Justin Bradbury observed the CAC interview and began investigating the allegations. On January 24, 2014, Det. Bradbury interviewed Carson. Throughout the four-hour interview, Det. Bradbury employed the "Reid Technique," a multi-phase interrogation technique in which an investigating officer analyzes the suspect's behavior, looking for signs of deception, and then engages in a confrontational interrogation if they believe they spot such indicators. Carson ultimately admitted to a series of sexual acts, including the touching of genitals, masturbation, and oral sex.

Carson was indicted of four counts of first-degree sexual abuse; three counts of first-degree sodomy; and three counts of incest. Prior to trial, Carson moved to suppress his statements made to Det. Bradbury during his interrogation. He argued that Det. Bradbury violated his Fifth Amendment

---

[1] We use a pseudonym to protect the identity of the victim.

right to remain silent.  The trial court denied the motion, concluding that Carson failed to clearly invoke his right.

Following a lengthy pre-trial period, the case proceeded to trial in June of 2019.  The jury found Carson guilty on all counts.  The jury recommended a sentence of twenty years on each count of sodomy; twenty years on each count of incest; and five years on each count of first-degree sexual abuse.  The sentences were recommended to run concurrently for a total of twenty years' imprisonment.  The trial court sentenced him accordingly, and this appeal followed.  Additional facts relevant to Carson's claims of error are set forth below.

## II. ANALYSIS

### A. The admission of Det. Bradbury's opinion testimony concerning Carson's verbal and non-verbal cues of deception was reversible error.

Carson first asserts that the trial court erred in allowing Det. Bradbury to testify as to his ability to detect deception through verbal and non-verbal cues.  Carson contends that Det. Bradbury's testimony invaded the province of the jury when he testified that Carson exhibited behaviors consistent with deception during his interrogation.  We review a trial court's rulings on evidentiary issues for an abuse of discretion.[2]  The test for abuse of discretion

---

[2] *Meece v. Commonwealth,* 348 S.W.3d 627, 645–46 (Ky. 2011).

is whether the court's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[3]

Pursuant to KRE[4] 701, a lay witness may provide opinion testimony only if their opinion is (1) based on their perception; (2) helpful to a clear understanding of the witness' testimony or the determination of a fact at issue; and (3) not based on scientific, technical, or specialized knowledge. More often than not this rule permits shorthand testimony regarding certain inferences the witness drew from behavior they observed.[5] As a result, Kentucky law permits witnesses to give opinion testimony regarding a person's apparent intoxication;[6] the apparent age of a person;[7] and a person's apparent mental or emotional state.[8] The principle connecting each of these cases is that a witness may testify as to a conclusion they drew about a person's behavior from their personal observation of certain facts.

Further, "[t]he degree to which a witness may give an opinion, of course, is predicated in part upon whether and the extent to which the witness has sufficient life experiences that would permit making a judgment as to the

---

[3] *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 581 (Ky. 2000) (citing *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999)).

[4] Kentucky Rule of Evidence.

[5] *See* Federal Rule of Evidence (FRE) 701 advisory committee's note ("Witnesses often find difficulty in expressing themselves in language which is not that of an opinion or conclusion.").

[6] *Motorists Mut. Ins. Co. v. Glass*, 946 S.W.2d 437 (Ky. 1997).

[7] *Howard v. Kentucky Alcoholic Control Bd.*, 172 S.W.2d 46 (Ky. 1943).

[8] *Commonwealth v. Sego*, 872 S.W.2d 441, 444 (Ky. 1994).

4

matter involved."[9] Consequentially, law enforcement officers may provide lay opinion testimony as to their experience-based interpretations of certain facts which they personally observed.[10] Pursuant to this rule, this Court has permitted law enforcement officers to testify as to their interpretation of drug-sniffing dogs behavior;[11] that a juice bottle appeared to be a homemade silencer;[12] and that a suspect appeared intoxicated due to his performance on a field sobriety test.[13] But when the subject matter of the officer's opinion is either not based on personal knowledge or based on specialized knowledge, the trial court must first qualify the officer as an expert.[14]

One area in which neither lay nor expert testimony is appropriate is the veracity of a witness.[15] Just as we prohibit the introduction of mechanical

---

[9] *Hunt v. Commonwealth*, 304 S.W.3d 15, 35 (Ky. 2009) (internal citations and quotations omitted).

[10] *See e.g., Iraolo-Lovaco v. Commonwealth,* 586 S.W.3d 241, 247 (Ky. 2019); *Burton v. Commonwealth,* 300 S.W.3d 126, 140 (Ky. 2009) ("[P]olice officers and lay witnesses have long been permitted to testify as to their observations of a defendant's acts, conduct and appearance, and also to give an opinion on the defendant's state of impairment based upon those observations.") (citation omitted).

[11] *Debruler v. Commonwealth*, 231 S.W.3d 752, 757-58 (Ky. 2007).

[12] *Hunt v. Commonwealth*, 304 S.W.3d 15, 30-31 (Ky. 2009).

[13] *Iarolo-Lovaco v. Commonwealth*, 586 S.W.3d at 247.

[14] *See McGuire v. Commonwealth*, 595 S.W.3d 90, 95 (Ky. 2019) ("Whether a certain quantity of methamphetamine is consistent with personal use, whether a certain type of bag is generally used to carry drugs, and whether the items found on a person are indicative of personal drug use are all subjects outside the scope of lay witness testimony.").

[15] *Ordway v. Commonwealth*, 391 S.W.3d 762, 789 (Ky. 2013).

polygraphic evidence, we similarly restrict the ability of a witness to act as a human lie detector on the stand.[16] As such, "neither expert nor lay witness may testify that another witness or a defendant is lying or faking. That determination is within the exclusive province of the jury."[17]

Here, the challenged testimony centered on Det. Bradbury's use of the Reid Technique during his interrogation of Carson. When introducing the video recording of Carson's interrogation, the Commonwealth elicited testimony concerning the Reid Technique:[18]

> **Commonwealth (CW)**: You told us earlier that you underwent specialized training in conducting interviews or interrogations. Can you tell us more about the trainings that you have completed?
>
> **Det. Bradberry (DB)**: I attended a one-week course at the Department of Criminal and Justice Training in Richmond, Kentucky, and I attended a four-day course through the Jenny and John E. Reid Institute on interview and interrogation, as well as advanced interview and interrogation.
>
> **CW**: What is the John E. Reid technique or institute?
>
> **DB**: It is a nationally accepted technique. It is used by many, many police departments across the United States because of its high standard.

---

[16] *Cf. Ice v. Commonwealth*, 667 S.W.2d 671, 675 (Ky. 1984) (prohibiting the introduction of polygraph evidence).

[17] *Moss v. Commonwealth*, 949 S.W.2d 579, 583 (Ky. 1997) (quoting *State v. James*, A. 2d 471, 473 (R.I. 1989)).

[18] We note that this is not this Court's first encounter with the Reid Technique. *See Esper v. Commonwealth*, 2016-SC-0003666-MR, 2018 WL 898215 (Ky. Feb. 15, 2018); *see also Golden v. Commonwealth*, 2016-SC-000179-MR, 2017 WL 1536253 (Ky. Apr. 27, 2017). Though we ultimately affirmed those convictions, neither case presented the issue before us today: whether an investigating officer may testify that he believed a criminal suspect to be lying based on the Reid Technique's methods of behavioral analysis.

Det. Bradbury proceeded to describe the mechanics of the Reid Technique. A Reid interview begins with a series of questions intended to provoke certain physical or verbal responses. Based on the investigating officer's analysis of those responses, he or she will determine whether to proceed with questioning. Det. Bradbury described the behavioral analysis portion as follows:

> **CW**: You said the first phase, the behavioral analysis, you look at the body language and verbal cues, and you ask questions to provoke a response. Are your questions designed to provoke a response of guilt?
>
> **DB**: No.
>
> **CW**: What do you mean by that?
>
> **DB**: Its designed to provoke a response. We are looking for body language, verbal cues. We are look for things that indicate truthfulness or deception. That is what we are looking for.

As Det. Bradbury continued to describe how an interview is initiated, Carson objected. He argued that the Commonwealth had not certified Det. Bradbury as an expert in behavioral analysis. The Commonwealth responded that Det. Bradbury was being offered as a lay witness and the questioning concerned his training. The trial court overruled the objection but stated "[Det. Bradbury] can testify as to how he was trained and what he was trained to do and how he implemented that training…but he cannot come to conclusions on truth or honesty."

Yet, immediately thereafter, Det. Bradbury testified he was trained on his ability to determine a suspect's truthfulness:

7

**CW**: Does the Reid technique train you in what verbal or nonverbal cues to look for to identify whether a person is being truthful or being deceptive?

**DB**: It does.

**CW**: Ok, does your analysis of those cues affect how you proceed with your interview?

**DB**: It does.

**CW**: How so?

**DB**: If we see indications of deception, more specifically if we see groupings or clusters or multiple indicators of deception that may drive our decision to proceed into an interrogation.

**CW:** What if you don't see a cluster of cues indicating deception?

**DB**: I call that the drop back and punt phase. So, at that point we have options. We can stop the interview at that point, we can then pursue other avenues of investigation, follow up with leads, or search for other possible suspects.

Following this testimony, the court *sua sponte* called a bench conference. The court expressed concern that Det. Bradbury was purporting to be a "verbal lie detector" through his testimony. After a brief discussion the court admonished the jury as follows:

> Ladies and gentlemen, you've been hearing testimony about this interrogation technique called the "Reid Technique." You need to be advised that the jury is the determiner of credibility and truth, okay? You are the fact-finding body, so you do not consider that technique as being a determinative factor as to whether anything is being truthful or not truthful. Okay? Alright.

But the Commonwealth persisted with veracity questions directed to Det. Bradbury and he testified that regarding numerous "clusters" of non-verbal and verbal cues in Carson that caused him to elevate the interview to an

8

interrogation. The Commonwealth emphasized the meaning of this post-admonition testimony in closing argument:

> Det. Bradberry told you if there are no clues during the behavioral analysis portion, you can drop back and punt. But I want to talk about what those cues are. Det Bradbury told you he's looking for statements or indications of involvement, meaning indicators that there is validity to these claims of improper sexual behavior. Or in the case denial of that involvement, whether those denials are truthful.

Here, Det. Bradbury's testimony ventured beyond the proper scope of lay opinion. Initially, we emphasize the testimony regarding a suspect's body language is proper. Such testimony is fact-based and clearly derived from the perception of the interviewing officer. Furthermore, an investigating officer is surely permitted to testify as to his or her observations of a defendant during the interview and may even offer opinions regarding the defendant's demeanor.[19] Det. Bradbury's testimony in this case, however, concerned what he characterized as Carson's deception as revealed through the Reid Technique rather than his demeanor. Det. Bradbury testified that he spotted "clusters" of deceptive behaviors from Carson. Effectively, he testified that he was able to determine that Carson was lying through visual observation of his body language. This form of testimony infringes on the "province of the jury."[20]

---

[19] *See Bowling v. Commonwealth*, 942 S.W.2d 293 (Ky. 1997) (holding that officer may opine that defendant looked at them strangely or intensely) *overruled on other grounds by McQueen v. Commonwealth*, 942 S.W.2d 293 (Ky. 1997).

[20] *See Moss*, 949 S.W.2d at 583.

This impropriety was compounded by Det. Bradbury's claims of specialized knowledge of behavioral analysis. The detective testified that he participated in a four-day training in an advanced interrogation technique, developed by a private firm, which permitted him to determine if a person was being truthful through an analysis of their behavior. Importantly, Det. Bradbury did not claim that this knowledge derived solely from his experience as a detective, nor his involvement in numerous similar investigations. Instead, his ability to detect deceptive behavior stemmed from his application of the principles and mechanics of a technique taught by interrogation specialists. In doing so, he claimed to possess knowledge beyond that of a lay witness.

The admission of Det. Bradbury's Reid Technique based opinion concerning Carson's veracity was error. This error was preserved by Carson's contemporaneous objection. We review preserved evidentiary errors under the harmless error standard of RCr[21] 9.24.[22] Pursuant to this standard, those errors "will be deemed harmless...if we can say with fair assurance that the judgment was not substantially swayed by the error."[23] "Our inquiry is not simply whether there [is] enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself

---

[21] Kentucky Rules of Criminal Procedure.

[22] *Ordway*, 391 S.W.3d 762, 774 (Ky. 2013).

[23] *Brown v. Commonwealth*, 313 S.W.3d 577, 595 (Ky. 2010).

10

had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."[24]

Here, we are significantly concerned that Det. Bradbury's testimony had a substantial influence on the outcome of the case. The pillars of the case against Carson were his interview with Det. Bradbury, during which he made inculpatory statements, and Stephen's testimony. Throughout the four-hour interview, Carson makes inculpatory statements as to numerous criminal acts.

However, he also repeatedly denied many of Det. Bradbury's assertions regarding his interactions with Stephen. In a case where a significant portion of the evidence consists of the accused's own words, the erroneous introduction of improper opinion testimony concerning the veracity of those statements risk playing an outsized role in the judgment.

Here, the trial court noted the problematic nature of the testimony and attempted to provide an admonishment to the jury that it was not bound to accept Det. Bradbury's assertions as to Carson's credibility. And under our case law, the "jury is presumed to follow an admonition to disregard evidence and the admonition thus cures any error."[25] Such presumption can be overcome by a showing either that there is an (1) "overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible evidence would be

---

[24] *Id.* (internal quotations and citations omitted).

[25] *Dunlap v. Commonwealth*, 435 S.W.3d 537, 570 (Ky. 2013).

devastating to the defendant," or (2) the question asked lacks any factual basis and was highly inflammatory.[26]

Though we commend the trial court for quickly attempting to remedy the introduction of inappropriate testimony, the admonishment provided did not wholly address the error presented. Even after the admonishment, Det. Bradbury testified multiple times that he noted numerous cues in Carson's behavior that led him to proceed to the second phase of the interview. In doing so, he further perpetuated the error that the admonishment was intended to correct. Prior to the admonishment, he testified that these "clusters" of "cues" were behavioral indicators of untruthfulness. His post-admonishment statements, therefore, reaffirmed the specialized nature of his testimony and restated his opinion that he observed untruthful body language in Carson.

Though an admonishment is a powerful tool for redressing past errors, the perpetuation of an error post-admonishment necessarily weakens any effectiveness it may claim. In this case, there is a significant possibility that the jury failed to recognize the remedial force of the admonishment due to the continued introduction of problematic testimony. At bottom, we cannot conclude that the erroneous admission of this testimony was harmless. And, when considering the actual language of the admonishment, it permits the jury to consider the Reid Technique credibility testimony to be considered, just not as a "determinative factor".

---

[26] *Johnson v. Commonwealth*, 105, S.W.3d 430, 441 (Ky. 2003).

12

**B. Carson's Fifth Amendment rights were not violated because he failed to clearly invoke his right to remain silent.[27]**

Carson argues that the trial court failed to suppress his confession to Det. Bradbury in violation of his Fifth Amendment rights. Our review of a denial of a motion to suppress evidence consists of two steps.[28] First we review the trial courts factual findings for clear error; then, we review the trial court's application of the law to those facts de novo.[29] Carson claims that he attempted to invoke his right to remain silent twice during the interview and was ignored.

When a suspect invokes his right to remain silent, any custodial interrogation must immediately cease.[30] To be effective, however, any invocation of the right must be clear and unambiguous.[31] That is, a suspect must articulate his intention to remain silent "in a manner that a reasonable police officer in the situation would understand that the suspect wished for questioning to cease."[32]

Carson identifies two statements which he alleges should have put a reasonable officer on notice that he intended to end the interrogation. At one point during the interview, Carson tells Det. Bradbury to "please stop." Shortly

---

[27] This argument was preserved by Carson's motion to suppress his statements from the interview.

[28] *Welch v. Commonwealth,* 149 S.W.3d 407, 409 (Ky. 2004).

[29] *Id.*

[30] *See Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966).

[31] *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010).

[32] *Meskimen v. Commonwealth*, 435 S.W.3d 526, 531 (Ky. 2013).

13

thereafter, Carson states "I want to get out of here." Considered in isolation, each of these statements could be considered as expressions of intent to end the questioning. Considered in context, however, neither statement is clear and unequivocal.

The first statement "please stop" occurred after Det. Bradbury accused Carson of performing oral sex on Stephen. Carson conceded earlier in the interview that some touching and kissing had occurred but denied performing oral sex. After being confronted with the accusation, he said "Please stop. I'm telling the truth." A reasonable officer in the situation could understand that statement to mean "please stop accusing me of performing oral sex" rather than "please stop the interview." As such, this statement permits legitimate ambiguity in its interpretation and failed to invoke the right to remain silent.

The second statement, while less ambiguous, still failed to clearly indicate that Carson intended to remain silent and end the interrogation. After Det. Bradbury's repeated assertions that Carson was not providing the entire story, the following exchange occurred:

**Carson**: I don't… I want to get out of here. No, I know, no…I understand you're doing your job I know that.

**Det. Bradbury**: And I know you want to get out of here, buddy, we've got to get this resolved.

**Carson**: I didn't mean it like that. I mean, the stuff I told you, is what happened. That's it.

Carson continued speaking immediately after stating that he wished to leave. *Bullitt v. Commonwealth* proves instructive.[33] There, the defendant told officers that he was "done speaking," but continued to speak to detectives on his own volition afterwards.[34] As a result, we held his otherwise clear invocation was rendered ineffective.[35] Here, Carson's statement was less clear and he continued to engage with Det. Bradbury immediately. As a result, the statement was insufficient to invoke Carson's right to remain silent. Because Carson's Fifth Amendment rights were not violated, the trial court did not err in denying the motion to suppress.

## C. Supreme Court Rule (SCR) 3.130 (3.4)

Finally, Carson asserts that the prosecutor impermissibly gave unsworn testimony through her questioning of Stephen on re-direct examination. Because it is unlikely to recur, we do not address the issue fully. We emphasize, however, that SCR 3.130 (3.4) plainly prohibits an attorney from communicating personal knowledge of the facts at issue. On remand, counsel shall take care to conform their questioning to the requirements of this rule, as expressed in *Holt v. Commonwealth*.[36]

---

[33] 595 S.W.3d 106, 117 (Ky. 2019).

[34] *Id.*

[35] *Id.*

[36] 219 S.W.3d 731, 732-33 (Ky. 2007). *See also Fisher v. Commonwealth,* _ S.W.3d _, 2019-SC-0738-MR, 2021 WL 1133592 (Ky. 2021)(finding that an attorney erred when suggesting that they possessed personal knowledge due to an out of court conversation with a witness, though such error was found to be harmless).

## III. Conclusion

For the reasons set forth above, we reverse in part the judgment of the Kenton Circuit Court and remand the case for further proceedings consistent with this opinion.

Minton, C.J.; Conley, Hughes, Keller, Lambert, Nickell, and VanMeter, J.J.; sitting. Minton, C.J.; Conley, Hughes, Lambert, and VanMeter, J.J.; concur. Nickell, J., concurs in result only. Keller, J., dissents without opinion.

COUNSEL FOR APPELLANT:

Aaron Reed Baker
Assistant Public Advocate
Frankfort, KY

COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Mark D. Barry
Assistant Attorney General
Frankfort, KY

16