# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: FEBRUARY 15, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0215-MR

ANTONIO MARSONEL WILSON                                APPELLANT

V.                  ON APPEAL FROM WARREN CIRCUIT COURT
HONORABLE JOHN R. GRISE, JUDGE
NO. 19-CR-00461-002

COMMONWEALTH OF KENTUCKY                      APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

A jury of the Warren Circuit Court found Appellant Antonio Marsonel Wilson guilty of murder by complicity. The Commonwealth and Wilson then agreed to a sentence of 35 years. The trial court sentenced Wilson in accordance with that agreement. Wilson now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). After careful review, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Appellant Wilson was in a romantic relationship with Selma Maropija. Selma lived with her father Smajo Miropija, who did not like Wilson. On February 3, 2019, Smajo and a friend returned to Smajo's home where they found Wilson. An altercation ensued during which Smajo and his friend pushed Wilson, tried to drag him out of the house, and almost pulled his shirt

off. After the altercation, Wilson paced the street outside the home and commented to Selma's friend Brittany Apple that he was not done with Smajo. Wilson also later told Selma he would get back at Smajo.

The Commonwealth's theory at trial was that Wilson hired an associate named Jeffrey Lee Smith to kill Smajo for him. The proof established Wilson drove a black Camry which ultimately was found to have accelerant in the passenger seat, and that his fingerprints were found in a red Ford F-150 Smajo had for sale on nearby Louisville Road. Smith testified to being taken to Smajo's workplace in the Camry and later driving the F-150.

On February 8, 2019, Smajo was murdered and his body burned at his business, Mega Transport. There were numerous witnesses interviewed and a complicated trail of evidence investigated by the police. Police collected video surveillance footage from a number of locations that revealed the movements of vehicles of interest that day, including the F-150 that Smajo had for sale on Louisville Road. Wilson had keys to Mega Transport, where the key to the F-150 was kept on a wall.

The surveillance footage showed that Smajo arrived at work at 9:28 a.m. Around 10:15 a.m., a dark-colored passenger car parked near the F-150 Smajo had for sale on Louisville Road. The two vehicles then drove off the parking lot. At 10:18 a.m., a red Ford F-150 arrived at Mega Transport and one individual entered the building. A black car followed behind the F-150, then passed by Mega Transport several times while the F-150 was parked there. At 10:54

2

a.m., one person exited Mega Transport, got into the F-150, and departed heading toward Louisville Road.

Around 10:57 a.m. the F-150 and black car returned to their previous location on Louisville Road, where they stayed until 11:11 a.m. The black car then departed, stopping momentarily near the F-150 before continuing on to Louisville Road. At 11:32 a.m. the black car returned. The F-150 then pulled onto Louisville Road.

The F-150 returned to Mega Transport at 11:38 a.m., and left again at 11:41 a.m. headed away from Louisville Road. Smoke was then visible coming from the building. The F-150 returned to its previous location on Louisville Road at 11:46 a.m. At 11:47 a.m., the black car stopped and picked someone up from the F-150.

Around noon, Esnaf Ajanovic went to Mega Transport looking for Smajo because he could not reach him by phone. Esnaf found the door locked and left. Around 1:06 p.m., Smajo's brother Arif Miropija went to Mega Transport and found Smajo's burnt body lying on the floor. The head was completely blackened and fire was still present on the neck. An extension cord was later discovered wrapped around Smajo's neck. Subsequent medical examination revealed that Smajo's hyoid bone was fractured, his ribs were fractured, he had a hemorrhage on the back of his skull possibly caused by blunt force trauma, and the cause of his death was asphyxia via ligature strangulation.

On the day of the murder, Selma's friend Apple asked Wilson to go with her to check on Selma. Wilson had Apple pick him up at the Sonic on

3

Louisville Road. From there they drove to Mega Transport and saw police. Wilson asked Apple to go back to Sonic so he could get some food. They then parked in the parking lot of Apple's apartment while Wilson ate. They then returned to Mega Transport, where Apple got out and hugged Selma. Wilson stayed in the car and spoke with Selma only on the phone.

Selma testified that the morning of the murder, she tried to call Wilson several times but he did not pick up. Eventually Wilson told Selma he was at his mom's house, and that he was sick, had taken medication, and fallen asleep. Selma went to Wilson's house. While there, she received a call from a relative letting her know something had happened to her father. Selma left Wilson and drove herself to Mega Transport, where she learned her father had died. She texted Wilson with the news, left the scene, and went to Apple's apartment. Selma then went home.

Around 5:00 a.m. the following day, Bowling Green police made a traffic stop on Wilson. Police told Wilson detectives wanted to talk to him, but Wilson declined to do so. Around 6:00 a.m., Wilson went to Selma's house and stayed for approximately an hour. Selma later texted Wilson to ask if he had anything to do with her father's death. Wilson said no, asked if Selma was serious, and asked her if she thought he would do that or have something to do with it. Wilson asked Selma to see him the evening of February 9, and she said no. Selma and Wilson never talked again.

The morning after the murder, police observed a black Camry in the driveway at the home of Wilson's mother. They saw the vehicle at Wilson's

house later that day.  Around 7:00 p.m. that evening, police conducted a stop of the black Camry while Wilson's mother was driving it.  During the stop, Wilson's mother repeatedly received calls from a phone number with a 270-area code.  Police called the number back and spoke to Wilson, who asked if there was a warrant.

Selma and Wilson were scheduled to take a Valentine's Day trip to San Francisco from February 13 to February 17, 2019.  However, around 9:51 p.m. on February 9 Wilson began attempting to book a flight to the Philippines.  He successfully booked the flight the next morning at 4:32 a.m. and was on the flight when it departed Chicago at 9:50 a.m. on February 10.  Wilson traveled under his own name, had a return ticket scheduled, and contends he took the trip to visit a relative because he was upset by Selma's doubts in him.  He took the trip with awareness police wished to speak with him, but also with awareness no warrant had been issued.  Evidence at trial showed the Philippines has an extradition treaty with the United States.  Selma learned of Wilson's trip to the Philippines from one of Wilson's family members.

While Wilson was in the Philippines, the Bowling Green Police Department arranged for cancellation of his passport and extradition back to the United States.  Before trial, Wilson filed a motion to exclude evidence of his trip as consciousness of guilt, which the trial court denied.

Again, Wilson's associate Smith was the person allegedly paid by Wilson to kill Smajo.  In an interview with police, Smith acknowledged beating Smajo at Mega Transport on the day of the murder.  Smith's DNA was also found

5

under Smajo's fingernails. Smith told police Wilson hired him to kill Smajo. Wilson's son Antonio Jr. also testified he told Selma after the murder that his father had hired someone out of Memphis to kill Smajo. However, Antonio Jr. also testified that his statement to Selma was false, and that he made it because he had been mad at his father. Antonio Jr. also later told police he thought Selma had set Wilson up.

Jessica McKinney knew Smith from working in a laundromat next door to a liquor store where Smith worked, and had seen Smith talking to Wilson there. In February 2019, she asked to speak with police after she was arrested on a child support warrant. McKinney told police that on February 8, Wilson asked her for Smith's phone number. She further testified that she had sex with Wilson, and that he had a 513-area code phone number. McKinney also said she saw Smith on February 9, the day after the murder, and that he was not acting normal, that he had a newly chipped tooth and was missing some hair, that he made her feel uneasy, and that his breathing turned funny when she read him a news article about Smajo's murder.

Smith's girlfriend Angel Cook testified at trial that Wilson's phone number changed from month to month. She further testified that Wilson did business with Smith, and that a week before the murder she overheard a conversation between Wilson and Smith regarding Smith being used as "muscle, somewhere along the lines of a bouncer." According to Cook, Smith came home the day of the murder with his tooth knocked out and no shirt on,

6

only shaking his head when she asked what happened.  Cook also admitted she lied in her initial statement to police in order to protect Smith.

In late February police executed a search warrant at Wilson's residence. There they located a key and key fob for the black Camry.  When police searched the Camry, an accelerant-detecting dog alerted on the front passenger seat.  Gasoline was ultimately found to be present.  Law enforcement also pulled fingerprints from inside the door at Mega Transport and from the F-150 that were consistent with Wilson's fingerprints.

Law enforcement also obtained cell phone records from two phones.  The first was the 270-area code phone registered to Wilson, while the second was a 513-area code prepaid phone connected to him by other witnesses.  Use of the 513-area code ceased on February 8, 2019, while use of the 270-area code phone ceased the following day at 8:21 p.m.

Before trial, Wilson moved to exclude as unreliable all evidence of cell tower location data.  The Commonwealth then identified F.B.I. Special Agent Kevin Horan, a member of that agency's Cellular Analysis Survey Team, as an expert to offer an opinion that the historical cell tower data relating to Wilson's phones showed him in the general area at the time of the murder.  Following a *Daubert* hearing[1], the trial court denied Wilson's motion, concluding that the methodology was reliable and that Horan could testify so long as he referred only to general areas and acknowledged the limitations of the technology.

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

7

At trial, Smith admitted he had beaten Smajo on the day of the murder.[2] He testified that he first met Wilson a couple of years earlier, and that they did business together. According to Smith, killing Smajo was Wilson's idea because Wilson was angry Smajo laid hands on him during the attack at Smajo's home. Smith testified Wilson offered him $10,000 and a new truck to commit the murder.

Smith further testified he told Wilson he would have to think about his offer. Smith stated Wilson took him to Mega Transport a couple of nights before the murder to see the place. According to Smith, Wilson picked him up on the day of the murder in a black Camry and took Smith to a truck. Smith testified he fought with Smajo for a long time and did not want to kill him. However, when Smith realized Smajo would see that Smith was driving the F-150, he decided to knock him out. He testified that he struck Smajo with a tire thumper three or four times in the chin and neck area.

Smith also testified that Wilson picked him up after he returned the Ford F-150 to Louisville Road. Smith said Wilson stated at that time they had to be sure Smajo was dead, so they went to get a container of gasoline, returned to the F-150, and went back to Mega Transport. Smith testified that Wilson went into the building and started the fire. According to Smith, they then went back to get the black Camry and return the F-150 to Louisville Road. Smith got into the Camry with Wilson, who took him back home. Smith acknowledged he did

---

[2] At the time of Wilson's trial, Smith had not received any offer for his testimony and was still facing a life sentence. Court records indicate Smith ultimately plead guilty and was sentenced to twenty years on September 7, 2023.

not come forward until he was arrested, and admitted he did not tell the truth in his initial interview with police.

Special Agent Horan also testified at trial. He testified that the cell tower data indicated it would be logical to assume the 270 and 513 area code phones were together on the day of the murder, but he did not know whether it meant they were actually together. He said the data also showed that the phones moved west together between 9:15 and 9:21 a.m. Special Agent Horan acknowledged the maps he showed the jury were not meant to illustrate where the phone was at particular times, but rather were a best estimate of the general area where the phone could have been. He further acknowledged the data was not highly accurate as to where the phones were, that he could offer only general estimates, and that the phones could have been more than a mile from the murder scene. He also testified that he purposefully ignored certain outlying data points as "fliers," considering those not particularly reliable. One such example was a data point showing one of the phones in a field across the river.

Wilson also presented expert testimony at trial on the issue of cell tower location data from Prof. Adrian Lauf, a professor of computer science and engineering at the University of Louisville who conducts research with wireless communications. Dr. Lauf testified that Special Agent Horan's report did not support the idea that either phone was near the crime scene. He testified that there are fewer cell phone towers in the area at issue, and thus the data suffers from a higher error rate. He further stated that if any data points are

9

disregarded as unreliable "fliers," it undermines the entire accuracy of every location estimate given. Dr. Lauf also testified that two phones in the same place will not necessarily create the same footprint, as one might appear to be in Smith's Grove to the north of Bowling Green with the other appearing to be south of Bowling Green in Richpond.

Wilson moved to strike Special Agent Horan's testimony, arguing his analysis was unreliable given his admission that he disregarded "flier" data points. The trial court denied the motion because Special Agent Horan had provided only general locations, acknowledged the limitations of his analysis, and Wilson had an opportunity to attack that analysis with his own expert.

The trial court instructed the jury on murder by complicity and facilitation and first-degree manslaughter by complicity and facilitation, but denied Wilson's request for instructions on second-degree manslaughter by complicity and facilitation. The jury found Wilson guilty of murder by complicity. He was found not guilty of tampering with physical evidence and abuse of a corpse. The Commonwealth and Wilson then agreed to a sentence of 35 years, and the trial court sentenced in accordance with that agreement. Wilson now appeals.

**ANALYSIS**

Wilson raises three issues for our review: (1) whether the trial court erred in allowing evidence of Wilson's trip to the Philippines after the murder; (2) whether the trial court erred in admitting and refusing to strike Special Agent Horan's expert testimony regarding historical cell tower location data;

10

and (3) whether the trial court erred in refusing to instruct the jury on the lesser-included offenses of manslaughter in the second degree by complicity and by facilitation. We review each issue in turn, providing additional facts as necessary.

## I. Evidence of Wilson's Trip to the Philippines Was Relevant and Not Unduly Prejudicial.

Wilson first argues the trial court erred by allowing the Commonwealth to present Wilson's trip to the Philippines as evidence of flight with consciousness of guilt. Wilson's allegation of error is preserved by his pre-trial motion in limine which the trial court denied. KRE 103(d).

The trial court found that evidence of Wilson's trip was admissible given that Wilson traveled on a ticket purchased on the spot only a couple of days after the murder. The trial court noted that Wilson of course could present the jury with his innocent explanation for the trip. In its opening, the Commonwealth argued Wilson had fled to the Philippines. The Commonwealth asked various witnesses about Wilson's trip and introduced as an exhibit the booking details for his flight. For its final witnesses, the Commonwealth elicited testimony regarding the process of Wilson's return trip back to the United States with law enforcement. The Commonwealth again referred to Wilson's trip to the Philippines in its closing argument.

We review an allegation of nonconstitutional evidentiary error for abuse of discretion. *Mason v. Commonwealth*, 559 S.W.3d 337, 339 (Ky. 2018). That is, we ask whether the trial court's ruling was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* (quoting *Lopez v.*

11

*Commonwealth*, 459 S.W.3d 867, 872-73 (Ky. 2015)). Wilson acknowledges that evidence of his trip to the Philippines was likely relevant, but argues admission of that evidence was nonetheless error because the evidence was unduly prejudicial. We disagree.

Kentucky law has long held that evidence of "flight to elude capture or to prevent discovery is admissible because 'flight is always some evidence of a sense of guilt.'" *Rodriguez v. Commonwealth*, 107 S.W.3d 215, 218 (Ky. 2003) (quoting *Hord v. Commonwealth*, 227 Ky. 439, 13 S.W.2d 244, 246 (1928)). Such evidence is relevant because "it has a tendency to make the existence of the defendant's guilt more probable: a guilty person probably would act like a guilty person." *Id.* at 219.

Here, Wilson booked his travel to the Philippines on the morning of February 10, 2019, two days after the murder. He booked the trip despite having a separate trip already planned with Selma for the same timeframe, and on the same day police asked him to come in for an interview. Also—and unusually—he bought the ticket for same-day international travel to the Philippines. These circumstances were sufficient to support a reasonable inference that Wilson's conduct was in furtherance of an effort to elude capture or prevent discovery. As such, proof of his trip was highly probative of his consciousness of guilt, and thus relevant.

Nonetheless, even where flight evidence is relevant, its admissibility remains subject to the balancing test of KRE 403. *Id.* That is, evidence of flight, even if relevant, is inadmissible if "its probative value is substantially

12

outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403.

Here, Wilson contends admission of evidence regarding his trip to the Philippines resulted in undue prejudice. As the plain language of KRE 403 makes clear, only where otherwise relevant evidence presents a risk of *undue* prejudice, *i.e.,* prejudice that is unnecessary and unreasonable, should it be excluded. *See Price v. Commonwealth*, 31 S.W.3d 885, 888 (Ky. 2000). And then, only if that risk *substantially* outweighs the probative value of the evidence. As noted above, evidence of Wilson's trip was highly probative of the ultimate issue of guilt, given that he booked his trip for same-day international travel two days after the murder, on the same day police sought to interview him, and despite having an existing trip already planned with Selma. While Wilson undoubtedly faced prejudice from admission of this evidence, he was permitted to present his innocent explanation for the travel to the jury and thus ameliorate that prejudice. Given the highly probative nature of the evidence and Wilson's ability to offer a competing innocent explanation for his trip, the trial court did not abuse its discretion in concluding that any prejudice to Wilson did not substantially outweigh the probative value of evidence of his flight. We thus perceive no error in the admission of that evidence.

13

## II. The Trial Court Did Not Err in Allowing the Commonwealth's Expert to Testify Regarding Historical Cell Tower Location Data.

Wilson next argues the trial court erred in allowing Commonwealth expert Special Agent Kevin Horan to testify regarding the location of Wilson's cell phones on the day of the murder based upon cell phone tower data. Wilson filed a pre-trial motion to exclude Special Agent Horan's proposed testimony as unreliable, which the trial court denied after holding a *Daubert* hearing. After Special Agent Horan testified at trial, Wilson again moved to strike his testimony as unreliable. Wilson's allegation of error is thus preserved. *Meskimen v. Commonwealth*, 435 S.W.3d 526, 534 n.8 (Ky. 2013); KRE 103(a)(1).

KRE 702 governs the admission of expert testimony, providing that

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:

(1) The testimony is based upon sufficient facts or data;

(2) The testimony is the product of reliable principles and methods; and

(3) The witness has applied the principles and methods reliably to the facts of the case.

In applying this Rule, "the trial court functions as a 'gatekeeper' charged with keeping out unreliable, pseudoscientific evidence." *Miller v. Eldridge*, 146 S.W.3d 909, 913 (Ky. 2004). The trial court "must first assess the reliability of the expert testimony . . . and then evaluate its relevance." *Id.* at 914. "[T]he consideration of reliability entails an 'assessment into the validity of the

14

reasoning and methodology upon which the expert testimony is based.'"
*Toyota Mot. Corp. v. Gregory*, 136 S.W.3d 35, 39 (Ky. 2004) (quoting *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 578 (Ky. 2000)). A trial court's determination regarding the reliability of expert testimony is a finding of fact that we review for clear error. *Miller*, 146 S.W.3d at 915. In contrast, a trial court's determination of "whether the evidence will assist [the] trier of fact and the ultimate decision as to admissibility" is a discretionary decision that we review for abuse of that discretion. *Id.*

Here, we perceive no clear error in the trial court's determination after the *Daubert* hearing that the historical cell tower data methodology relied upon by Special Agent Horan was reliable. We previously explained that methodology in *Holbrook v. Commonwealth*, 525 S.W.3d 73, 80 (Ky. 2017):

> [C]ell phones are essentially radios, as they use radio signals to contact cell towers. Each tower is unique and has identifiers that allow cell providers to determine what specific tower a phone communicated with during the logged activity. Most cell towers are engineered to cover a 360-degree radius which is typically broken down into three sectors. When a user makes a phone call, the cell phone connects to the tower and sector with the strongest signal, which is often, but not always, the closest tower to the caller. Through reviewing cell phone records, which reflect which tower a phone connects to at a specific date and time, Special Agent Horan could determine the general location of a phone at a particular time. By determining the cell phone tower and sector, Special Agent Horan can identify a general area or "footprint" within which the phone was located at a given time.

Significantly, however, such data "does not identify a cell phone user's location with pinpoint precision—it identifies the cell tower that routed the user's call." *Id.* at 79 (quoting *United States v. Davis*, 785 F.3d 498, 515 (11th Cir. 2015)).

15

In *Holbrook,* we concluded there was no abuse of discretion in the trial court's conclusion that this methodology was sufficiently reliable to support expert testimony, provided the expert acknowledges in his testimony the limitations of the technology and its inability to identify a cell phone's location with pinpoint precision. *Id.* at 81. In the present case, the trial court found that Special Agent Horan employed the same methodology at issue in *Holbrook.* The trial court further—and appropriately—considered nonetheless whether the methodology continues to enjoy scientific acceptance. *See Meskimen,* 435 S.W.3d at 535-36 (noting that while trial courts may take judicial notice of a methodology's reliability once accepted by an appropriate appellate court, "it is the trial court's duty to ensure that method is supported by scientific findings, or at least not seriously questioned by recent reputable scientific findings, before taking judicial notice of its acceptability"). The trial court's conclusion that the methodology remains reliable was supported by Special Agent Horan's testimony that the methodology is the gold standard worldwide, and that an independent academic study within the last several years found the methodology reliable. Moreover, the trial court further noted the methodology also enjoys acceptance in the law enforcement and business communities. As such, we find no clear error in the trial court's conclusion following the *Daubert* hearing that Special Agent Horan's methodology was sufficiently reliable to allow him to testify as an expert.

Wilson also argues the trial court should have stricken Special Agent Horan's testimony at trial because in his testimony he admitted to disregarding

16

outlying data points termed "fliers." Horan testified the "fliers" were unreliable because they were isolated and inconsistent with other groupings data points. However, we do not conclude Special Agent Horan's exclusion of data points he deems unreliable rendered his testimony wholly inadmissible.

Special Agent Horan acknowledged to the jury that he had excluded the unreliable data points. Wilson presented his own expert regarding the historical cell tower location data, and also vigorously cross-examined Special Agent Horan regarding his exclusion of the unreliable data points. Moreover, Special Agent Horan specifically informed the jury that he could provide only general estimates rather than pinpoint-precise proof of the cell phone locations. Under these circumstances, Special Agent Horan's admitted exclusion of certain data points he deemed in his expertise to be unreliable went to the weight rather than the admissibility of his testimony. Wilson was certainly free to—and did—seek to undermine Special Agent Horan's conclusions on that basis. And the jury was properly left to weigh the competing expert testimony and determine what it believed. As such, we perceive no error in the trial court's refusal to strike Special Agent Horan's testimony.

### III. Wilson Was Not Entitled to Jury Instructions on Manslaughter in the Second Degree by Complicity or Facilitation.

Finally, Wilson argues the trial court erred by refusing to instruct the jury on the lesser-included offenses of manslaughter in the second degree by complicity and by facilitation. Wilson requested such instructions and his allegation of error is therefore preserved. RCr 9.54(2). When a defendant contends the trial court erred either in failing to provide a requested jury

17

instruction or in providing an unwarranted jury instruction, we review the decision for abuse of discretion. *Commonwealth v. Caudill*, 540 S.W.3d 364, 367 (Ky. 2018).

The trial court in a criminal case must instruct the jury on the whole law of the case. RCr 9.54(1). Thus, the trial court must give "instructions applicable to every state of the case deducible from or supported to any extent by the testimony." *Thomas v. Commonwealth*, 170 S.W.3d 343, 349 (Ky. 2005). A defendant "is entitled to an instruction on any lawful defense that he has, including the defense that he is guilty of a lesser included offense of the crime charged." *Id.* (citation omitted) (citing *Slaven v. Commonwealth*, 962 S.W.2d 845, 856 (Ky.1997); *Sanborn v. Commonwealth*, 754 S.W.2d 534, 550 (Ky.1988)). "An instruction on a lesser included offense is required if the evidence would permit the jury to rationally find the defendant not guilty of the primary offense, but guilty of the lesser offense." *Id.* (citing *Commonwealth v. Wolford*, 4 S.W.3d 534, 539 (Ky.1999); *Smith v. Commonwealth*, 737 S.W.2d 683, 687 (Ky.1987)). In considering on appellate review whether a requested instruction was warranted, we consider the evidence in the light most favorable to the requesting party, *id.* at 347, asking "whether a reasonable juror could acquit of the greater charge but convict of the lesser." *Allen v. Commonwealth*, 338 S.W.3d 252, 255 (Ky. 2011).

As relevant here, a murder conviction requires proof the defendant intended to and did cause the victim's death. KRS 507.020(1)(a). Manslaughter in the first degree requires proof the defendant intended to cause

18

serious physical injury and in fact caused the victim's death. KRS 507.030(1)(a). The trial court provided the jury with murder and first-degree manslaughter instructions on both complicity and facilitation theories, and the jury found Wilson guilty of murder by complicity.

However, the trial court declined to instruct the jury as to second-degree manslaughter by complicity or facilitation. A conviction for second-degree manslaughter may be obtained by proving, as relevant here, that the defendant wantonly caused the victim's death. KRS 507.040(1). For purposes of our criminal statutes, "[a] person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists." KRS 501.020(3). Our statute governing complicity criminal liability provides:

> A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he
>
> > (a) solicits, commands, or engages in a conspiracy with such other person to commit the offense; or
> >
> > (b) aids, counsels, or attempts to aid such person in planning or committing the offense; or
> >
> > (c) having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so.

KRS 502.020(1).

Wilson first contends he was entitled to an instruction on second-degree manslaughter by complicity because Smith testified that when he beat Smajo he did not intend to kill him but rather only to render him unconscious so

19

Smith could escape. In other words, Wilson asserts that because the evidence could support a finding Smith did not have the requisite state of mind for murder (intent to kill) or first-degree manslaughter (intent to seriously injure), the jury should have been allowed to consider whether Smith wantonly killed Smajo. Wilson contends that such a finding would amount to a conclusion that Smith committed only second-degree manslaughter, in which case the jury could have found Wilson guilty of complicity to second-degree manslaughter.

Not so. Long-standing Kentucky law holds that a principal's state of mind is irrelevant to determining the criminal complicity liability of his accomplice:[3]

> The principal actor's mental state with respect to his own conduct, or the degree of his criminal liability, is largely immaterial to the criminal liability of an accomplice or the degree thereof. . . . [E]ven in the pre-penal code era, the degree of an accomplice's liability was determined by his or her own *mens rea* and not that of the principal . . . That proposition was codified in KRS 502.030(1) [which provides that in] any prosecution for an offense in which the criminal liability of the accused is based upon the conduct of another person pursuant to KRS 502.010 and KRS 502.020, it is no defense that . . . such other person has not been prosecuted for or convicted of any offense based on the conduct in question, or has previously been acquitted thereof, or has been convicted of a different offense. . . . [I]f an accomplice can be convicted despite the acquittal of the principal, it follows that the degree of the

---

[3] In the context of criminal complicity liability, the "principal" is the person who commits the crime and the "accomplice" is the person who solicits, commands, conspires, aids, counsels, or attempts to aid the commission of the offense, or who fails to perform a legal duty to prevent the offense. *See Tharp v. Commonwealth*, 40 S.W.3d 356, 365 (Ky. 2000). Here, describing Wilson as Smith's "accomplice" is somewhat counter-intuitive given that it was Wilson's idea to kill Smajo, his apparent motivation for the killing was to avenge Smajo's attack on him, and he solicited Smith (who had never met the victim) for that purpose. Nonetheless, because Smith killed Smajo following Wilson's solicitation, Smith is the principal and Wilson the accomplice for purposes of assessing criminal complicity liability.

20

offense of which an accomplice is convicted does not depend upon the degree of which the principal is convicted.

*Tharp*, 40 S.W.3d at 365. Thus, any change-of-heart *Smith* may have had during his attack on Smajo is irrelevant to determining *Wilson's* criminal complicity liability. It is Wilson's state of mind rather than Smith's that determines the level of Wilson's criminal complicity liability. There was no evidence Wilson enjoyed a similar change-of-heart. Indeed, the evidence was simply that Wilson solicited Smith to murder Smajo, and that Smith alone decided during the course of the attack that he did not want to kill Smajo. As such, Smith's change-of-heart did not entitle Wilson to a second-degree manslaughter by complicity instruction.

Wilson also argues he was entitled to a second-degree manslaughter by complicity instruction because Smith's girlfriend Angel Cook overheard a conversation between Wilson and Smith regarding Smith being used as "muscle, somewhere along the lines of a bouncer." Wilson contends that based upon this statement, a reasonable juror could conclude Wilson did not ask Smith to kill or seriously injure Smajo, but rather only to engage in some other conduct that resulted in Smith wantonly killing Smajo.

However, in considering the evidence presented at trial as a whole, no reasonable juror could infer that the comment overheard by Cook referred only to Smith injuring rather than killing Smajo. The evidence at trial was that Wilson asked Smith to kill Smajo, not do something else to him. Smith testified Wilson asked him to kill Smajo. Wilson's son also testified he told Selma Wilson had hired someone to kill Smajo. In stark contrast, Wilson

21

points us to no evidence presented at trial that he solicited Smith to do something *other* than killing Smajo. Given this context, no jury could draw a reasonable inference that the statement overheard by Cook was a reference to Smith doing something other than killing Smajo. Thus, even considering this evidence in the light most favorable to Wilson, it does not support a reasonable inference that Wilson asked only that Smith injure Smajo rather than kill him.[4] As such, we find no error in the trial court's refusal to instruct the jury as to second-degree manslaughter by complicity.

Finally, we also find no error in the trial court's refusal to provide an instruction as to second-degree manslaughter by facilitation. Criminal facilitation liability arises when the defendant, "acting with knowledge that another person is committing or intends to commit a crime, . . . engages in conduct which knowingly provides such person with means or opportunity for the commission of the crime and which in fact aids such person to commit the crime." KRS 506.080(1). "Facilitation reflects the mental state of one who is 'wholly indifferent' to the actual completion of the crime." *Baker v. Commonwealth*, 545 S.W.3d 267, 280 (Ky. 2018) (quoting *Perdue v. Commonwealth*, 916 S.W.2d 148, 160 (Ky. 1995)). Thus, where there is no evidence of such indifference, a facilitation instruction is not warranted. *Id.*

As noted above, the trial court provided murder and first-degree manslaughter facilitation instructions. A second-degree manslaughter

---

[4] As noted above, the trial court provided the jury with a first-degree manslaughter by complicity instruction. Thus, the jury was allowed to consider whether Wilson only intended for Smith to seriously injure rather than kill Smajo.

facilitation instruction was warranted only if the jury could reasonably believe 1) that Smith did not intend either to kill or seriously injure Smajo, 2) that Smith acted only wantonly, meaning he was aware of and disregarded a substantial risk that he would kill Smajo, and 3) that Wilson, being wholly indifferent to Smith's commission of the crime, knowingly provided him with means or opportunity to commit the crime and in fact aided Smith in the commission of the crime. The evidence at trial could not support such findings.

First, even crediting Smith's testimony that he did not intend to kill Smajo as true, no reasonable jury could find that he did not, at a minimum, intend to seriously injure Smajo. Serious physical injury includes an injury which creates a substantial risk of death. KRS 500.080(18). Smith testified that he intentionally struck Smajo several times in the chin and neck area with a tire thumper with the hope of knocking him unconscious. Such conduct plainly was an intentional infliction of physical injury that created a substantial risk of death. Thus, no reasonable juror could find that Smith acted only wantonly, rather than with an intention either to kill or to inflict serious physical injury.[5]

---

[5] Wilson also argues because Smith testified he was high on methamphetamine at the time of the killing, the jury could have found he acted only wantonly by reason of voluntary intoxication. However, to be relevant to criminal liability, there must be evidence not only that the defendant was intoxicated, "but that he was so [intoxicated] that he did not know what he was doing." *Lickliter v. Commonwealth*, 142 S.W.3d 65, 68 (Ky. 2004) (citing *Springer v. Commonwealth*, 998 S.W.2d 439 (1999)). Here, Smith testified in great detail regarding his recollection of the attack on Smajo, and there was nothing in his testimony to support a reasonable finding he was so intoxicated he did

23

Likewise, no reasonable jury could find that Wilson was wholly indifferent to Smith's commission of the crime as required to warrant a facilitation instruction. There evidence was that Wilson solicited Smith to commit the crime as revenge for Smajo's attack on Wilson. Wilson points us to no competing evidence that Smith committed the crime of his own volition with Wilson's participation limited to that of a dispassionate and uninterested accomplice. As such, because no reasonable jury could find that Wilson was wholly indifferent to Smith's commission of the crime, the trial court did not err in refusing to provide a second-degree manslaughter by facilitation instruction.

## CONCLUSION

For the foregoing reasons, we affirm the judgment and sentence of the Warren Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Molly Mattingly
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Kristin L. Conder
Assistant Attorney General

---

not know what he was doing at that time. As such, Smith's voluntary intoxication is wholly irrelevant to his or Smith's criminal liability.

24